UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KENNETH HENDERSON,           )
                             )
         Plaintiff,          )
                             )
    v.                       )      No. 11 C 1142
                             )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,          )
                             )
         Defendant.          )

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff Kenneth Henderson seeks judicial review of the final decision of the Commissioner of Social Security denying his claim for a period of disability, Supplemental Security Income ("SSI") and Social Security Disability Insurance benefits under Titles II and XVI of the Social Security Act. Henderson filed a Motion for Summary Judgment (Dkt. No. 18) requesting that the Commissioner's decision be set aside or reversed and remanded. The Commissioner also filed a Motion for Summary Judgment (Dkt. No. 28) requesting that the Commissioner's decision be affirmed. For the reasons set forth below, Henderson's motion is denied, the Commissioner's motion is granted, and the Commissioner's final decision is affirmed.

BACKGROUND

Henderson filed a Title II application for a period of disability and supplemental disability insurance benefits and a Title XVI application for SSI on May 31, 2009. (*See* R. at 21.) Henderson alleged that he suffered from a variety of conditions causing him to be disabled, including obesity, prostate cancer, degenerative joint disease, coronary artery disease, congestive heart failure, and hypertension. (R. at 23.) In the application, Henderson alleged that his disability began on March

1, 2008. (R. at 21.) The Administrative Law Judge ("ALJ") denied Henderson's claims initially on September 25, 2009, and on rehearing on December 31, 2009. (*Id.*) Henderson then requested a hearing. It was held on July 20, 2010 by the assigned ALJ. (*Id.*)

On July 28, 2010, the ALJ denied Henderson's application for a period of disability and disability insurance benefits, finding that, for the period from March 1, 2008, through the date of the hearing, although Henderson had some limitations, he was capable of performing sedentary work. (R. at 25, 32.) Henderson requested review of the ALJ's decision, and the Social Security Administration's Appeals Council denied his request on December 23, 2010 (Dkt. No. 1-1, at 1), making the July 28, 2010, ruling by the ALJ the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561 (7th Cir. 2009). Henderson filed his complaint in this court on January 13, 2011, seeking judicial review of the Commissioner's final decision. (Dkt. No. 1.) The case was initially assigned to Judge William Hibbler. Cross motions for summary judgment were filed. Briefing on those motions followed. Judge Hibbler passed away on March 19, 2012, before he could rule on the pending motions. The case was reassigned to this court on March 21, 2012.

STANDARD OF REVIEW

The court performs a *de novo* review of the ALJ's legal conclusions, while giving deference to the ALJ's factual determinations. *Jones v.Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). In other words, the court "will uphold the Commissioner's decisions so long as the ALJ applied the correct legal standard and substantial evidence supported the decision." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *see also* 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Jones*, 623 F.3d at 1160 (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). When reviewing for substantial

evidence, the court does not substitute its own judgment for that of the ALJ by re-weighing evidence or making credibility determinations. *Skinner*, 478 F.3d at 841. The court does, however, require that the ALJ adequately explain his decision by building "a 'logical bridge' between the evidence and the conclusions so that [the court] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Jones*, 623 F.3d at 1160 (quoting *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)).

## ANALYSIS

I.   Listing 1.02

The Social Security Administration requires an ALJ to follow a five-step process to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a). The five-step process requires the ALJ to ask:

> 1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments (the grid) that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and 5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience.

*Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). When applying those steps, "[a] negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." *Id.*

Step three provides a short cut for a claimant to show a disability without an inquiry into his ability to perform employable work, instead allowing him "to establish his entitlement to benefits by showing that he has an impairment equal in severity to a list of severe impairments that the Social

Security Administration maintains." *O'Connor v. Sullivan*, 938 F.2d 70, 72 (7th Cir. 1991) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). Here, after reaching step three, the ALJ considered Listings 1.02, 4.02, and 13.24, and determined that Henderson's impairments did not satisfy the requirements of any of those listings.

On appeal, Henderson's first argument is that the ALJ's decision must be reversed and remanded because the ALJ failed to adequately explain its determination that Henderson's alleged degenerative joint disease in his left knee does not satisfy Listing 1.02, and thus failed to build "a 'logical bridge' between the evidence and [the ALJ's] conclusions." *Jones*, 623 F.3d at 1160 (citation omitted). Listing 1.02 sets out in relevant part the following requirements for disability:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. Section 1.00B2b explains that:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or

uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b.

Henderson is correct that the ALJ's explanation of why Henderson's impairments do not meet the criteria of that listing is remarkably terse, providing no more than a mere recitation that Henderson does not meet the criteria. (*See* R. at 25.) Henderson overlooks, however, that the ALJ's reasoning at step four is adequate to address all of the evidence in the record and to explain the ALJ's conclusion at step three. (*See* R. at 25-31.) Moreover, "[b]ecause it is proper to read the ALJ's decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses [in multiple steps], we consider the ALJ's treatment of the record evidence in support of" step four when considering whether his explanation about step three is adequate. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004).

At step four, the ALJ considered all relevant evidence Henderson presented to show he suffered from degenerative joint disease in his left knee. Specifically, the ALJ considered Henderson's testimony that he needed to use a cane because "I have swelling in my legs and my knees," and because "it hurts to bend my leg sometimes and my knees won't bend" as a result of "arthritis in the knees and stuff." (R. at 68, 72; *see also* R. at 26.) The ALJ also considered that an x-ray taken on September 8, 2009, found that Henderson had a "[s]evere degree of tri-compartment degenerative disease of the left knee" (R. at 324), and that a consultative doctor, Dr. Weiss, had noted that Henderson "had decreased range of motion in both knees, secondary to pain" (R. at 330). (*See* R. at 29-30.) In addition, the ALJ noted that a treating physician, Dr. Janikirama, reported on

March 28, 2009, that Henderson complained that he had difficulty walking and that his knees hurt. (R. at 297; *see also* R. at 30.) Moreover, the ALJ acknowledged that the treating physician deemed it appropriate to complete paperwork allowing Henderson to apply for disability benefits because of his knee ailments. (R. at 30.)

The ALJ also explained why he discounted that evidence. Specifically, the ALJ discounted Dr. Janikirama's report because on May 18, 2009, Dr. Janikirama also noted that Henderson reported that his knee was improving after he lost some weight, and that therefore he had elected not to see an orthopedist. (R. at 291; *see also* R. at 27, 30.) Moreover, Dr. Weiss's examination determined that Henderson "took no medication, had no injections, and had no physical therapy for his knee." (R. at 30 (citing R. at 326).) Dr. Weiss also reported Henderson's comments that he was able to shop leaning on a grocery cart, and could stand for 15 to 20 minutes at a time. (R. at 30; *see also* R. at 326.) Those facts led the ALJ to conclude that Henderson's complaints were not credible, and that Dr. Janikirama's opinion that Henderson was disabled was not supported by the record. (R. at 31.) Finally, the ALJ also noted that the state agency physician, Dr. Wabner, and the doctor performing the residual functional capacity assessment, Dr. Ezike, both found Henderson capable of walking for up to two hours in a day, despite his knee problems. (R. at 335, 447; *see also* R. at 30-31.) In short, the ALJ provided an adequate explanation for his decision, and Henderson points to no significant evidence that the ALJ did not consider and address, if not in his explanation about step three, then in his explanation at step four. The ALJ's explanation was sufficient. *See Rice v. Barnhart*, 384 F.3d at n.5.

The ALJ also adequately considered whether Henderson's obesity[1] was an aggravating factor

---

[1] Henderson weighs over 300 pounds at a height of 5'10". (R. at 68.)

allowing him to meet the requirements of Listing 1.02. *See Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (obesity "must be considered for its incremental effect on the disability"). First, the ALJ noted that Henderson's obesity limited the range of motion of his knee (R. at 30 (citing R. at 330).) However, the ALJ gave weight to the opinion of Dr. Wabner, who fully considered Henderson's obesity before coming to his determination that Henderson could nonetheless walk for up to two hours each day. (R. at 30.) Similarly, the ALJ credited Dr. Ezike's opinion (R. at 30), which also considered Henderson's obesity before concluding that Henderson was capable of walking and standing for up to two hours in an eight-hour work day (R. at 447). From that evidence, the ALJ determined that Henderson's knee problems, even in combination with his obesity, did not create an inability to ambulate effectively, and did not meet the requirements of Listing 1.02.

II.     Credibility

Henderson's next argument is that the ALJ did not properly evaluate the credibility of Henderson's testimony about his symptoms and the effect his impairments had on him. To justify his decision, an ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting Soc. Sec. Ruling 96–7p). If the presiding ALJ does not provide a basis for his credibility determination sufficient to allow the court to engage in meaningful review, the court will remand to the ALJ to further elaborate his decision. *See id.* at 888. Factors that the ALJ must consider include "the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Otherwise, however,

"[c]redibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). If the ALJ provides a sufficient explanation of his credibility decision, it will not be overturned unless "'patently wrong.'" *Zurawski*, 245 F.3d at 887 (citation omitted).

Here, the ALJ listed each of Henderson's statements about his symptoms, and then explained his reasons for discrediting each statement, including a discussion of each of the required factors where relevant. For example, in the second to last paragraph on page eight of the ALJ's decision, the ALJ discussed Henderson's testimony about his daily activities, including his testimony that he drove his wife to work each day, but otherwise mostly sleeps or lies down, and that he is able to shower only once a week. (R. at 28.) Against those statements, the ALJ noted Henderson's statements on consultative examination that he was capable of dressing, cooking, and grocery shopping while leaning on a cart (R. at 28 (citing R. at 326).) In addition, the ALJ also noted (R. at 28) that in August of 2009, Henderson "denied being physically inactive, unable to perform activities of daily living . . . weakness and fatigue." (R. at 438.) Later, the ALJ also noted that there was no evidence that Henderson had any side effects from his medications or problems sleeping that would support his assertion that he is not alert during the day. (R. at 29.) From that evidence, the ALJ was justified in concluding that the assertion that Henderson needed to sleep all day was not credible.

Similarly, the last paragraph on page eight of the ALJ's decision discusses Henderson's testimony that his frequent urination, need to elevate his legs, and depression problems were severely limiting his daily activities. (R. at 28.) The ALJ discredited Henderson's comment about his depression problems because the records of Dr. Kirsh, who treated Henderson for prostate

cancer, indicated that from July 2009 through January 2010, Henderson did not suffer from depression. (*See* R. at 28 (citing R. at 421-26).) The ALJ also referred to Henderson's statements to Dr. Kirsh (R. at 28) in August of 2009 that Henderson "denies psychiatric care, anxiety attacks, history of depression, manic depression, nervousness and panic attacks." (R. at 439.)

Next, the ALJ discredited Henderson's statement about the need to elevate his legs. Henderson had testified that a doctor told him that he should be elevating his legs because of his congestive heart failure and medication. (R. at 77.) The ALJ discredited that statement because the record did not indicate that a doctor ever told him to elevate his feet, other than immediately following his foot problems in early 2008. (R. at 29.) Henderson contends that the ALJ's analysis is deficient because "the ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562. The discredited statement relates to Henderson's recollection of what a doctor told him, however, not to his pain or limitations. Accordingly, the ALJ's inference that Henderson's statement is untrustworthy because of the absence of any recorded instruction of leg elevation is valid.[2]

The ALJ then closely examined the history of Henderson's prostrate cancer treatment. In that context, the ALJ considered Henderson's statement that he had trouble getting to the bathroom because of an urgent need to urinate four to five times a day. (*See* R. at 71.) The ALJ discounted that statement because in August of 2009, following Henderson's treatment for prostate cancer, Dr. Moran, who was assisting with his treatment, found that he had no urinary symptoms. (R. at 29

---

[2] On the question of whether Henderson actually felt the need to elevate his legs (rather than the question of whether a doctor told him to elevate his legs), Henderson testified only that he elevated his legs when he was sitting at the computer, not that he did so at other times or that he was required to do so always. (R. at 77.) The ALJ thus was justified in concluding that Henderson's need to elevate his legs, such as it was, did not interfere with his ability to perform sedentary work.

(citing R. at 439).) Moreover, the ALJ noted that Henderson did not wear protective undergarments (R. at 29), suggesting that his urinary problems were not so severe as to require a significant life change. The ALJ's credibility determination about Henderson's urination complaints was justified.

Finally, the second to last paragraph on page nine of the ALJ's decision discussed Henderson's comments that he becomes short of breath when walking down one flight of stairs. The ALJ credited that statement in part, but noted that the record supported only the conclusion that Henderson's shortness of breath was "occasional." (R. at 29.) In support, the ALJ noted the reports of several treating physicians in which Henderson failed to report or denied shortness of breath or fatigue. (*Id.* (citing R. at 274, 374).) The ALJ also noted one physician's decision to grant Henderson approval to work in Denver for ten days in March of 2008. (*Id.* (citing R. at 275).)

Henderson does not point to any evidence in the record that the ALJ did not already consider in making his credibility determination. Instead, Henderson repeatedly insists that the ALJ was incorrect to discredit Henderson's testimony merely because of Henderson's ability to engage in minimal daily activities and criticizes the ALJ for inferring a lack of credibility merely from a lack of objective medical evidence supporting Henderson's statements. As outlined above, however, the ALJ's credibility determination was based on much more, including repeated affirmative statements by Henderson and his doctors in the medical record that Henderson did not suffer to the same extent from the ailments of which he complained at the hearing. The ALJ's determination was adequately supported.

Henderson next contends that the ALJ used "backwards reasoning" by determining Henderson's functional capacity first, and then finding Henderson not credible to the extent he testified about limits inconsistent with the ALJ's functional capacity findings. Henderson bases his

(citing R. at 439).) Moreover, the ALJ noted that Henderson did not wear protective undergarments (R. at 29), suggesting that his urinary problems were not so severe as to require a significant life change. The ALJ's credibility determination about Henderson's urination complaints was justified.

Finally, the second to last paragraph on page nine of the ALJ's decision discussed Henderson's comments that he becomes short of breath when walking down one flight of stairs. The ALJ credited that statement in part, but noted that the record supported only the conclusion that Henderson's shortness of breath was "occasional." (R. at 29.) In support, the ALJ noted the reports of several treating physicians in which Henderson failed to report or denied shortness of breath or fatigue. (*Id.* (citing R. at 274, 374).) The ALJ also noted one physician's decision to grant Henderson approval to work in Denver for ten days in March of 2008. (*Id.* (citing R. at 275).)

Henderson does not point to any evidence in the record that the ALJ did not already consider in making his credibility determination. Instead, Henderson repeatedly insists that the ALJ was incorrect to discredit Henderson's testimony merely because of Henderson's ability to engage in minimal daily activities and criticizes the ALJ for inferring a lack of credibility merely from a lack of objective medical evidence supporting Henderson's statements. As outlined above, however, the ALJ's credibility determination was based on much more, including repeated affirmative statements by Henderson and his doctors in the medical record that Henderson did not suffer to the same extent from the ailments of which he complained at the hearing. The ALJ's determination was adequately supported.

Henderson next contends that the ALJ used "backwards reasoning" by determining Henderson's functional capacity first, and then finding Henderson not credible to the extent he testified about limits inconsistent with the ALJ's functional capacity findings. Henderson bases his

argument on the ALJ's statement toward the beginning of his discussion of step four that "[t]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 27.) In context, however, this court reads that statement to be a summary of the ALJ's conclusions, appropriately headlining the discussion on the following pages which provides the grounds for the ALJ's conclusions. (*See* R. at 28-31.) Moreover, the court does not read the ALJ's statement to mean that he found Henderson not credible because Henderson's testimony conflicted with the ALJ's decision. To the contrary, the ALJ's statement means that the ALJ found that Henderson's statements were credible in part, and were part of the grounds for the ALJ's assessment that Henderson's functional capacity was limited to sedentary work. The ALJ discredited Henderson's statements only to the extent they suggested a more restrictive functional capacity, and he did so for the reasons explained in the following pages. (*See* R. at 31 ("To the extent the claimant alleges greater limitations, his testimony is not fully credible.").) The ALJ's credibility determination was adequately supported, and the court will not second guess it.[3]

III.    Other Arguments

Henderson also contends that the ALJ failed to consider his alleged need to elevate his legs when making his residual functional capacity assessment. The evidence does not support any need for Henderson to elevate his legs, however. To the contrary, Henderson testified only that he

---

[3] Henderson also again attacks the ALJ for an inadequate discussion of obesity. Each of the comments of Henderson and his doctors in the medical records that the ALJ found to discredit Henderson's statements, however, were made in the context of Henderson's obesity after taking it into account. For example, if Henderson's obesity had contributed to his shortness of breath and fatigue, he could have mentioned it to his doctors, but instead he reported to his doctors at various times that he did not suffer from those ailments. (*See, e.g.*, R. at 274, 374.)

-11-

elevated his legs when he sat at the computer (R. at 77), but did not indicate that he elevated his legs at other times, or that he was required to do so at all times.[4] Henderson's argument fails.

Henderson similarly contends that the ALJ failed to consider Henderson's fatigue and his need to lie down frequently each day. The ALJ, however, did not find Henderson's statements about his fatigue credible enough to justify further work restrictions, and he listed a variety of evidence in the medical record in support of his determination. (R. at 29 (citing R. at 438 ("He denies being physically inactive, unable to perform activities of daily living . . . weakness and fatigue."); R. at 349 ("[T]he patient is complaining of a little bit of fatigue . . . ."); R. at 348 (patient "wakes up in the morning and he is still fatigued" but otherwise "has been doing well"); R. at 274 (reporting no fatigue)).) The ALJ's citations to the record adequately justify his decision that Henderson did not suffer from fatigue sufficient to prevent him from doing sedentary work.

Finally, Henderson contends that the ALJ failed to consider Dr. Ezike's opinion in his report that Henderson could stoop only occasionally. (R. at 449.) An ability to stoop occasionally, however, is consistent with a limitation to sedentary work. *See* Soc. Sec. Ruling 96-9p ("A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work."). Even if the ALJ had considered Dr. Ezike's opinion, therefore, it would not have changed his conclusion. Any error was thus harmless. *Sahara Coal Co. v. OWCP*, 946 F.2d 554, 558 (7th Cir. 1991) ("The

---

[4] Henderson did state that a doctor told him to elevate his legs (R. at 77), but there is no indication of when that occurred, or what the precise requirements of the doctor's instructions were, or how long they remained in effect. Moreover, as explained above, the ALJ's decision to discount the credibility of Henderson's statement about his doctor's instructions was justified.

harmless-error doctrine is available in judicial review of administrative action; it is an exception to the *Chenery* principle. . . . If the outcome of a remand is foreordained, we need not order one." (citations omitted)).

## CONCLUSION

For the reasons explained above, Henderson's motion for summary judgment [18] is denied, and the Commissioner's motion for summary judgment [28] is granted. The final decision of the Commissioner denying Henderson disability benefits is affirmed. Civil Case Terminated.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: October 26, 2012